UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GLORIA THREADGILL, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>MARGARET SPELLINGS[1], SECRETARY, )<br>   U.S. DEPARTMENT OF EDUCATION, )<br>)<br>Defendant. )<br>) | Civil No. 02-2232 (RCL) |

MEMORANDUM OPINION

Introduction

     This matter comes before the court on defendant's motion for summary judgment on the age discrimination claim. Gloria Threadgill filed this suit after she was not promoted to the position of Management Analyst for the Department of Education's Office of Civil Rights (the "Department") at the GS-14 level, stating that her non-promotion was based on discrimination on the basis of age. Plaintiff's complaint alleges age discrimination in promotion practices, in violation of the Age Discrimination in Employment Act (ADEA).

     Upon consideration of the defendant's motion and reply, the opposition thereto, as well the relevant law, defendant's motion for summary judgment is denied.

---

[1] Substituted pursuant to Federal Rules of Civil Procedure 25d.

1

Factual Background

In 1999, plaintiff, age fifty, was employed as a GS-13 Management Analyst on the Human Resource Team ("HRT") in the Education Department's Office of Civil Rights, and had been in this position for three years. As a Management Analyst, plaintiff was one of the most senior members of the team, and before this position held a variety of positions within the Department of Education. In her position as Management Analyst for the HRT, she worked in many aspects of human resource services, as her boss indicated by stating he considered her "to be a right hand." Dorka Dep. at 92. During her tenure on the HRT, Ms. Threadgill compiled an excellent record, and earned various awards. Additionally, Ms. Threadgill has served as the acting manager a number of times. Plaintiff's Motion at 6-8.

In March 1999 the Department posted a vacancy for a new Management Analyst position in the Office of Civil Rights ("OCR") HRT, as a career ladder position, meaning that the department could either hire someone as a GS-14 or GS-13. Nicholas Dorka, the selecting official, and team leader for the HRT, wrote the job vacancy, as well as the KSAs (Knowledge, Skills, and Abilities), for the position. The Human Resources Group in the Office of Management initially screened all the applicants, and a certificate of eligibles was given to Dorka, who made the decision that the final selection would be based on the candidates' answers to a set of predetermined questions largely based on the KSAs for this position. Mr. Dorka selected two other, non-HRT members to sit on the interview panel with him. Rosemary Fennel and Karen Hakel, neither of whom had any experience with the human resources department. were hand selected by Mr. Dorka to be part of the interview panel. Mr. Dorka was the selecting official, and determined the final decision. Dorka Int. ¶ 6.

Mr. Dorka stated that all the interviewees were qualified candidates, and the selectee Ms. Moorefield performed the best during the interview. The Department contends that key criteria for hiring were the panelists scores on the interview. Defendant's Memorandum in Support of His Motion for Summary Judgment ("Def.'s Motion") at 10. Plaintiff, who was fifty one at the time of the incident, alleges that the proffered reason was a really a pretext, and that the real reason why Ms. Moorefield, aged thirty one, was hired and Ms. Threadgill was not was age discrimination by the selecting officials. Plaintiff states that she was not promoted because of her age, in violation of the Age Discrimination in Employment Act, (ADEA), 29 U.S.C. § 633a.

Plaintiff filed her complaint on November 13, 2002, and after the parties conducted discovery, defendant moved for summary judgment.

Legal Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To determine which facts are "material," a court must look to the substantive law on which each claim rests. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A "genuine issue" is one whose resolution could establish an element of a claim or defense and consequently affect the outcome of the action. Celotex, 477 U.S. at 322.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true.

Anderson, 477 U.S. at 255.  If summary judgment is denied, there must be evidence on which the jury could reasonably find for the non-moving party.  Id. at 252.  A nonmoving party, must establish more than a "mere existence of a scintilla of evidence" in support of its position. Id.  Furthermore, if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment may be granted. Celotex, 477 U.S. at 322.  Pointing to the absence of evidence proffered by the nonmoving party, may allow the moving party to succeed on summary judgment. Id.

Analysis

I. Disparate Treatment Claim- McDonnell Douglas Framework

The plaintiff in a disparate treatment case, bears the burden of proving that his employer intentionally discriminated against him. To make such a showing of discrimination, the plaintiff can rely on either direct or indirect evidence to support the charge.  If there is no direct evidence, the plaintiff can use indirect evidence and the burden shifting analysis articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

Under the ADEA, it is "unlawful for an employer ... to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). When a plaintiff alleges disparate treatment, "liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision." Hazen Paper Co. v. Biggins, 507 U.S. 604, 610, (1993).  For the plaintiff to establish discrimination

under ADEA, she must establish that, "but for" her age, she would not have been subjected to the action at issue. Hayman v. National Academy of Sciences, 23 F.3d 535, 538 (D.C. Cir. 1994). Although the McDonnell Douglas framework was developed for Title VII analysis, it also applies to ADEA claims. O'Connor v. Consolidated Coin Caterers Corp, 517 U.S. 308 (1996); Reeves v. Sanderson Plumbing Products, Inc. 530 U.S. 133, 141 (2000); Hall v. Giant Food, Inc., 175 F.3d 1074, 1077-78 (D.C. Cir. 1999).

Under the McDonnell Douglas analysis, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981); McDonnell Douglas, 411 U.S. at 802. In the ADEA context a complainant makes his required prima facie showing if he shows that: (1) he is a member of the ADEA's protected class of persons over forty years of age; (2) he was qualified for his position (3) he suffered an adverse employment action despite his qualifications and performance; and (4) he was disadvantaged in favor of similarly situated younger employees. Mianegaz v. Hyatt Corp., 319 F.Supp.2d 13, 19 (D.D.C. 2004).

Once the plaintiff has shown a prima facie case of discrimination, the burden of production shifts to the employer to "articulate some legitimate, non-discriminatory reason" for his actions. Burdine, 450 U.S. at 254-55; McDonnell Douglas, 411 U.S. at 803. The employer must only introduce some evidence that he was not motivated by a discriminatory reason. Burdine, 450 U.S. at 257. The reasons can be objective or subjective, as long as the employer articulates a clear and reasonably specific factual basis on which it bases its opinion. Carter v. George Washington Univ., 180 F. Supp. 2d. 97, 104 (D.D.C. 2001). At this point, the employer is not required to convince the court that it was actually motivated by the suggested reasons, as

long as he raises a genuine issue of fact as to whether they discriminated against the plaintiff. Stewart v. Ashcroft, 211 F. Supp 2d 166, 171 (D.D.C. 2002).

If the defendant produces this evidence, the McDonnell Douglas system, "with its presumptions and burdens disappears and the sole remaining issue is discrimination *vel non*." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142-43 (2000). The plaintiff then bears the burden of proving that the reasons articulated by the defendant for the employment actions are merely a pretext for discrimination. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511 (1993). A employee can prove pretext by producing evidence of the falsity of the employer's stated reason, as well as any direct evidence of discrimination, comparative evidence, or statistics. 1 Barbara Lindemann & Paul Grossman, Employment Discrimination Law 26 (3d ed. 1996).

At that point, to "survive summary judgment the plaintiff must show that a reasonable jury could conclude that [he] was [rejected] for a discriminatory reason." Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1290 (D.C. Cir.1998). The Court must note that" '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " Reeves, 530 U.S. at 143 (quoting Burdine, 450 U.S. at 253).

A. Ms. Threadgill Establishes A Prima Facie Case

The Department concedes Ms. Threadgill presents a prima facie case for age discrimination. Def's Motion at 5. At the time Ms. Threadgill applied for the position at issue, she was fifty (50) years old, and therefore a member of the protected class under ADEA. Plaintiff

was qualified for the position to which she applied.  Plaintiff had worked as a GS-13 Management Analyst for three years prior to her application for promotion, and had a Mater's degree.  Additionally, she was included in those "Certificates of Eligibles" who were granted interviews.  Mr. Dorka stated that although all interviewees had different combinations of education and experience, he believed they were all "qualified candidates for the position." Dorka Int. ¶ 8.  Despite her qualifications, Ms. Threadgill was not promoted to the position of GS-14 Management/ Program Analyst.  The final selectee, Nichelle Moorefield, was almost twenty years younger than Threadgill at the time of the promotion.  Plaintiff's Motion at 2.

B. <u>Defendant Provides Legitimate and Nondiscriminatory Reasons for Its Hiring Decision.</u>

In response to Threadgill's prima facie case, the Department puts a forth legitimate and non-discriminatory reason for its non-promotion of Threadgill.  Defendant states that the "key criteria" used to select the new Management Analyst was the interview conducted by the panel. Def's. Motion at 10.  Moorefield was selected because she received higher scores on her panel interview, specifically, the panel determined through the interview that she had a wider breadth of experience.  Def.'s Motion at 1.  The Human Resources Group in the Office of Management initially screened all the applicants, and a certificate of eligibles was given to Dorka.  Dorka in turn, made the decision that the final selection would be based on the candidates' answers to a set of predetermined questions.  Dorka states the questions were based on the desired "Knowledge, Skills, and Abilities" (KSAs) for this position.  Dorka Int. ¶ 4; Fennel Depo. at 26.  Making a final selection based upon personal interviews is a reasonable method of hiring an employee.  <u>See</u> <u>Fischbach</u>, 86 F.3d 1180, 1184 (D.C. Cir. 1996).

C. <u>Plaintiff Provides Sufficient Evidence to Support an Inference of Discrimination</u>

Because the employer has met its burden of producing a nondiscriminatory reason for his action, we must ask whether the factfinder could infer discrimination from the combination of 1) the plaintiff's prima facie case; 2) evidence the plaintiff presents to attack the employer's proffered reasons for its action; and 3) any further evidence the plaintiff may present or any contrary evidence that the employer may present.  <u>Aka v. Washington Hospital Center</u>, 156 F.3d 1284, 1289 (D.C. Cir. 1998).  Here, the evidence plaintiff provides in all three categories is enough to create a triable issue.

i. Interview Process

The Department of Education states that the selectee received the highest score on her panel interview, and specifically the panel took notice of the breadth of her experience. Plaintiff's Motion at 1.  Mr. Dorka, the "selecting official," wrote the original job description as well as the KSAs, and created the list of eleven interview questions, which he based on the KSAs.  Dorka Dep. at 58.  Making a final selection based only on personal interviews is a reasonable method of hiring a professional employee.  <u>Fishcbach</u>, 86 F.3d at 1183-84.  Although this process is a reasonable, it is not based on any objective criteria, but only on the subjective opinions of the panel members.  <u>See</u> Dorka Dep. at 248 ("How can an interview- a reaction to an interview be anything less than subjective?").  Courts traditionally examine explanations that rely on subjective considerations with caution.  <u>Aka</u>, 156 F.3d at 1298.

The panelists asked each candidate a series of eleven questions, and scored them according to their answers.  Each question has a maximum value of five points, for a maximum

8

total of fifty five points.  The selectee, Ms. Moorefield, received perfect scores of fifty-five from both Ms. Hakel and Ms. Fennel, and a score of forty-eight and three quarters from Mr. Dorka. Ms. Threadgill received a score of forty from Ms. Fennel, thirty-seven from Ms. Hakel, and thirty-seven and a half from Mr. Dorka.  See Def. Ex 5.  In examining the questions, the plaintiff's answers, the selectee's answer, and their respective scores, Ms. Threadgill alleges that this interview was merely a pretext for discriminatory practice by the panel.  The Court agrees that based on the record there is enough evidence from which a reasonable factfinder could infer pretext.

     The ninth interview question states "Give an example of a pressure situation that you recently faced, and explain what you did to meet your responsibilities or to solve the problem." Mr. Threadgill described a major conflict on the team which she was leading.  Each team member was highly specialized, which created a tense atmosphere in which each member required a great amount of attention from plaintiff.  She stated that she came up with a plan in which she would solve the issue within the team, without letting it get out of hand.  The selectee answered the same question by saying she would try to find where the pressure was coming from, and if she did not know she would do research and based on this would relieve the pressure.  The plaintiff received the following scores for that question: Ms. Hakel, 3; Ms. Fennel, 2; Mr. Dorka, 3. The selectee received 5 from Ms. Fennel, a 5 from Ms. Hakel, and a 4.5 from Mr. Dorka. Although interview scores are subjective, a perfect score would seem to denote that the panelist could want nothing more than the answer which was given.  It is unclear how a perfect score can be awarded for an answer that clearly does not address the specifics of the question.  Question nine asks for a specific example, so it is puzzling how Ms. Moorefield's answer, which does not

contain an example, can receive a perfect score. The panelists offer no specific explanation for why she was awarded a "5". See Hakel Dep. at 83.

Similarly, question three asks "Who are the customers in your current job? What are the fundamentals of high quality customer service? Give examples of your excellent customer service. In her deposition, Ms. Fennel states that in scoring a candidate's response, she would have looked for concrete examples of "what they thought they excelled at. . . and where they were recognized for excelling" Fennel Dep. at 91. Ms. Moorefield does provide an answer which states who her customers were, and also states that following through, paying attention to detail, and getting the proper information are important to customer service. Ms. Moorefield does not give any specific examples of her excellence in customer service, yet Ms. Fennel and Ms. Hakel both award her a perfect score. Ms. Threadgill, on the other hand, does state a specific example, and is awarded a three by Ms. Hakel.

In answering question eight, Ms. Threadgill used the word "norming" as a term to mean getting adjusted and getting the team to work together. Ms. Hakel awarded Ms. Threadgill a 3 for her response, stating that she could not state anything that was missing from the response, but that a three was the score she gave. Hakel Dep. at 80. In her written comments during the interview, Ms. Hakel noted that the Plaintiff used the term "norming" and admitted this notation was one of criticism, because she believed that term is "a piece of jargon. . .that doesn't get you very far in actually trying to develop team work." Id. This use of the term "norming" is the only aspect of the plaintiff's answer that Ms. Hakel identifies for why she might have received a poorer score. Curiously, in her deposition, Ms. Fennel uses the term "norming" in a similar context as did Ms. Threadgill used it in her interview. Fennel Dep. at 106. From this it appears

that people in this line of work use this term, and does not seem like something which would merit such criticism as was received from Ms. Hakel. It is possible that Ms. Hakel does have an aversion to jargon in general, but the record suggests otherwise. In Ms. Moorefield's answer to question six, she uses the word "synergy" to describe good team structure. Is it unclear how Ms. Hakel can both praise and criticize different applicant's use of jargon. While discrepancies in the scores of the interview are not conclusive that the panel interview was a pretext for selecting Moorefield based on a discriminatory reason, there is enough for a factfinder to infer discrimination.

ii. Other evidence of discrimination

While comments suggesting that employers might have considered discriminatory factors are clearly relevant, stray remarks are not sufficient to prove discrimination. See Price Waterhouse v. Hopkins, 490 U.S. 228, 271 (1989) (O'Connor, J. concurring). Stray remarks are generally comments made in isolated situations or made out of context of the employment decision. Dunway v. Int'l Brotherhood of Teamsters, 310 F.3d 758 (D.C. Cir. 2002). Additionally, the term "new blood" by itself does not always connote age discrimination, because taken in its literal sense it can mean that organization wanted to consider people outside the team, both young and old. However the term could intimate the replacement of older employees with younger ones. This court will interpret the words "new blood" in light of the surrounding circumstances. See MacDonald v. Swedish Health Services, 91 F.3d 153, 1996 WL 366604 (9th Cir. 1996). In certain circumstances, the use of the term "new blood" has been deemed sufficient evidence to infer discrimination. See Buckley v. Hospital Corp. of America, 758 F.2d 1525,

1527-28 (11th Cir. 1985) (sufficient evidence of discrimination based on comments that the hospital needed "new blood", in connection with the desire to attract younger employees, and repeated comments on plaintiff's advanced age); cf Cone v. Longmount United Hosp. Ass'n, 14 F.3d 526, 531 (10th Cir. 1994) (CEO's general statement that they "need some new, young blood" are considered stray remarks).

     Ms. Threadgill states she often heard Dorka use the term "newer and younger blood" in general at staff meetings, as well as in the context of hiring for position of Management Analyst. See e.g., Threadgill Dep. at 10.  Plaintiff also provides affidavits of co-workers which corroborate Ms. Threadgill's statements, such as Ms. Johns statement that Dorka "a lot of time in staff meetings said he wants newer, younger blood on the team." Plaintiff's Ex. 4 at 118. Another co-worker, Mr. Smith often heard subtle comments about age, such that the members of the Human Resources Team were all "over the hill." Smith Decl.¶ 2.  Diane Jordan also noted that she believed Dorka thought they needed to bring in younger people on to the staff, and based this belief on conversations she had heard in the office. Jordan Decl. ¶ 7.

     Although Mr. Dorka does not admit using the term "young blood", he does admit to often using the term "new blood."  In fact, he states that he has said this to many people on the team, and in his office, but that he in no way mentioned anything like this to the other interview panelists. Dorka Dep. at 171.  Additionally, Ms. Smith, Ms. Jordan, as well as Ms. Harris stated that in discussing the new vacancy during a team meeting, Mr. Dorka stated that he wanted to hire "new blood" meaning someone outside the team and that Mr. Fairily, the Executive Offcier, had to be called into the meeting to settle the employees down.  See e.g, Jordan Decl. ¶ 5.  Mr. Dorka denies this happening.  Dorka Dep. at 188.  Ms. Threadgill notes that she heard these types

of comments over the course of years while working under Mr. Dorka, as well as during meetings pertaining to the hiring of the new Management Analyst.

In this context, a reasonable factfinder could infer that "new blood" was synonymous with "young blood." At least one other co-worker, along with the plaintiff, has stated that he has heard Mr. Dorka use these two phrases in tandem. Moreover, Mr. Dorka admitted using the phrase new blood when talking to and about his team, who are all (except for one temporary employee) over the age of forty-five. Even though Mr. Dorka does not admit saying "young blood" to his team members, it is clear that many of them infer this from his admitted comments about "new blood." See Jordan Decl. ¶ 7; Def's Reply at 4. These comments by Mr. Dorka were not isolated ones which can be regarded as stray remarks. Ms. Threadgill stated that she heard at least five times, and heard them in a general context, as well as in the specific context of the new Management Analyst position. Threadgill Dep. at 79-81. For plaintiff to survive summary judgment, the court must only find that, from the evidence presented, the factfinder *could* infer discrimination. In light of the circumstances, this Court concludes that this is the case.

Plaintiff also asserts that Mr. Dorka influenced the other panelists, thereby tainting the interview process. When one with a discriminatory animus participates in the decision making process together with others, the court cannot say conclusively that those others were completely insulated from this influence. Griffin v. Washington Convention Ctr., 142 F.3d 1308, 1311 (D.C. Cir 1998). In Reeves v. Sanderson Plumbing Products, Inc.,197 F.3d 688, 694 (5th Cir. 1999), the Fifth Circuit held that, inter alia, the discriminatory comments were only made by one of three decision-makers, this was not enough for the plaintiff to survive summary judgment. On a grant of certiorari, the Supreme Court stated the Fifth Circuit erred in giving too much weight

"to the fact that there was 'no evidence to suggest that any of the other decision makers were motivated by age.'" Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 153-54 (2000); see also Hernandez v. City of Ottawa, Kan, 991 F.Supp. 1273, 1278 (D. Kan. 1998) (finding that the legitimacy of the entire interview process could be undermined if some or all of the panelists skewed their interview scores based on a discriminatory reason).

Here, there is no question that Mr. Dorka is one of three decision makers, and is the "selecting official" for this position.  Although Ms. Threadgill offers no direct evidence of Mr. Dorka's influence over the other two panel members, there is enough from which a factfinder could infer that the other two panelists were not insulated from the animus.  Cf. Willis v. Marion County Auditor's Office, 118 F.3d 542, (7th Cir1997) (finding there was no connection between the subordinates' animus and the decision-maker's firing of the employee).  Mr. Dorka, Ms. Fennel and Ms. Hakel all deny that Mr. Dorka exercised any influence over the other panelists, however there may be circumstantial evidence to the contrary.  Mr. Dorka alone suggested the use of the panel as the sole criteria for ranking candidates.  He also handpicked the panelists himself, neither of which knew much about the Human Resources Department.  See Hakel Dep. at 19.  Neither of the panelists knew anything about what the final selectee's day-to-day responsibilities would be, so they relied on Mr. Dorka and the KSAs to know what to look for in the interview.  Id.; Fennel Dep. at 128.  Ms. Hakel, an attorney, has been a panelist, but for positions where the vacancy was within her office, or for another attorney in a different office. See Hakel Dep. 9-10.  Mr. Dorka offers no reason for why he picked these two women to be on the panel.

In addition, Mr. Dorka admits using "new blood" when speaking to his team, his boss,

14

senior managers at headquarters, as well as other co-workers, but staunchly denies using the term in front of the other panelists. From this evidence, a reasonable factfinder could infer that the panelists were influenced by Mr. Dorka's discriminatory animus. If the court examines this evidence in light most favorable to the plaintiff, which it is required to do at this stage, there is certainly enough evidence of pretext to create a triable issue.

Conclusion

For the reasons stated above, plaintiff has successfully presented a triable issue of whether the defendant's proffered reason for failing to promote her was really a pretext for discrimination. Accordingly, summary judgment will be denied. A separate Order accompanies this Memorandum Opinion.

Signed by Royce C. Lamberth, United States District Judge, on July15, 2005.