## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
GLORIA THREADGILL,          )
                                    )
     Plaintiff,            )
                                      )
     v.                   )        Civil Action No. 02-2232 (RCL)
                                      )
MARGARET SPELLINGS,      )
Secretary, U.S. Department of Education, )
                                    )
     Defendant.          )
_____)

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case arises under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 633a, and is brought by Gloria Threadgill against the Secretary of the Department of Education ("Department"). Plaintiff alleges that the Department discriminated against her by denying her a promotion because of her age.

In 1996, the Department's Office for Civil Rights ("OCR") began restructuring to better serve its customers. OCR was composed of several divisions, including a Resource Management Group ("RMG"). RMG was, itself, composed of three teams: (1) the Human Resources Team ("HRT"); (2) the Budget Planning and Support Team ("BPT"); and, (3) the Correspondence Control Unit ("CCU"). HRT's function was to manage the OCR's "human capital" or personnel, including managing the recruitment, staff development and retention process. At the time of the reorganization, Nick Dorka became HRT's Team Leader. Plaintiff was reassigned to the RMG team upon its creation in 1996. Since 1996, plaintiff has worked as GS-345-13 Management Analyst with OCR's HRT. When it was created in 1996, the team included approximately 10-12 individuals, several of whom had, before the reorganization, served as

secretarial or clerical staff.

In March of 1999, HRT was permitted to advertise a competitive Management Analyst (GS-13/14) position.  The posting of the competitive Management Analyst position in March of 1999 was part of a management plan or means of bringing to HRT what management determined were needed new skill sets in order to better accomplish the tasks that were assigned to HRT. Mr. Dorka and his supervisor, Lester Slayton, discussed the idea of using an interviewing panel as a selection tool. Upon deciding that such an approach would be a good business practice, they further agreed on having OCR employees Karen Hakel and Rosemary Fennell as the other panelists in addition to Mr. Dorka.

Plaintiff submitted her application for the posted position and was one of twelve individuals who were found qualified for the job.  The panel interviewed nine candidates who Mr. Dorka determined were qualified based on his review of their applications. Plaintiff and several others were interviewed on Friday, September 24, 1999.  The individual ultimately selected, Nichelle Moorefield, was interviewed on Tuesday, September 28, 1999.  The panel asked each candidate the same series of 11 questions.  In this case, assuming that references were good, the applicants' interview performance served as the decisive component for the Department's ultimate selection of a candidate for this posted position because each individual interviewed was considered to be qualified.  The Department offered the senior analyst position to Nichelle (Moorefield) Henderson after she impressed the interview panelists with her show of initiative, quality accomplishments, and enthusiasm.  Ms. (Moorefield) Henderson was the unanimous, independent top choice of all three panelists.  After her interview, Mr. Dorka checked Ms. (Moorefield) Henderson's references and he was told that he would be taking one of the best people in her former unit.  According to defendant, there was no real close second place

finisher relative to the selectee's performance.  But plaintiff's performance did not put her in the

top third of any interviewer's rankings.  Interviewers found her performance average and some of

her answers rambling.  In the end, plaintiff's answers earned her no better than placement at the

bottom third of the qualified nine candidates competing for the opening.  Meanwhile, the

interview panelists' second and third choices were all within the ADEA protected class.

Shortly after Ms. (Moorefield) Henderson joined HRT, plaintiff filed this lawsuit.

Plaintiff claims that the Department of Education violated the ADEA when it denied her a

promotion because of her age.  Plaintiff seeks 1) promotion to the GS-14 Management and

Program Analyst position on the HRT, or an equivalent position, retroactive to September 30,

1999, with all step increases and other benefits she would have been entitled to in that position;

2) full back pay, to be calculated from September 30, 1999, taking account of all step increases

and other raises in pay that she would have received; 3) retirement contributions consistent with

the retroactive back pay and step increases ordered above; and 4) restoration of all leave which

plaintiff was forced to take in connection with the events at issue and the resultant litigation.  In

turn, defendant denies that its decision not to select plaintiff for promotion had anything to do

with her age, and claims that the selection process was fair and based on the sole criterion of the

interview.

## **FINDINGS OF FACT**

Based on a review of the extensive evidence presented at trial in December, 2005, and

after considering the testimony of the witnesses, the exhibits, and the arguments of the parties,

the Court makes the following findings of fact and conclusions of law.  Consistent with these

findings and conclusions the Court will enter judgment in favor of defendant.

1.  Plaintiff Gloria D. Threadgill is employed with the United States Department of Education ("Department"), in its Office for Civil Rights ("OCR") as a GS-345-13 Management Analyst.  She brought this action claiming that the unanimous selection of a younger person for a position (for which plaintiff had applied) – by of a panel of OCR interviewers – violated the Age Discrimination in Employment Act of 1967 ("ADEA"). This selection occurred on September 30, 1999, posted as a GS-13/14 vacancy within OCR's Human Resource Team ("HRT").  *See* Compl.

2.  OCR enforces several civil rights laws that prohibit discrimination in programs or activities that receive federal financial assistance as administered by and from the Department of Education.  *See* Ex. D2 (OCR Mission Statement); Trial Transcript ("T") at 520-521 (Lestor Slayton) and 604 (Karen Hakel).

3.  In 1996, OCR reorganized itself into several divisions, including a Resource Management Group ("RMG"), to better serve its customers. RMG acted primarily as a support group to other OCR components.  HRT was established as one of four teams that composed the RMG.  *See* Ex. D1 (OCR Organizational Chart). Nicholas Dorka was designated the HRT's acting Team Leader that year and was later competitively selected for it on a permanent basis. *See* T at 667-68 (Dorka).

4.  Immediately after the reorganization, Paul Fairley, a GS-15, was the RMG Head; Lestor Slayton was the Team Leader of the Budget and Planning Team.  Lester Slayton was a GS-14 Team Leader, who later became one of two GS-15s under Mr. Fairley.  Mr. Dorka was one of two GS-14 team leaders.  *See* Ex. D1; T at 14-15 and 50 (Fairley), 528 (Slayton), and 696 (Nicholas Dorka).

5.   HRT's primary function was to help manage the agency's "human capital" (*i.e.*, personnel), which included supporting OCR activities in recruitment, staff development and retention.  Also, HRT was tasked with responsibilities in the areas of procurement, management of information technology ("IT") assets and non-IT assets (e.g., furniture, and other property items), telecommunications, physical property and IT security, administration of certain contracts, simplified acquisitions, and miscellaneous administrative matters.  *See* T at 54-55 (Fairley), 94-96 (Johns), 197, 209, 672-78 (Dorka).

6.   The agency's 1996 restructuring process involved at least two agendas: Reduction of headquarters staff by shifting some personnel out to the field, and reducing the size of its secretarial-clerical support staff.  The latter was done by shifting such targeted personnel into upgraded program/management assistant positions – with the hope of better utilizing these persons' skills and abilities.  *See* T at 35 (Fairley), 524-25 (Slayton).

7.   The RMG was the last component to be created in OCR's 1996 reorganization. By this fact alone, available proven talent was already spread thin. One consequence was that about 50% of HRT personnel were upgraded program/management assistants.  Due to the self-selection process used, Mr. Dorka was not instrumental in selecting any of the 10-12 persons placed with HRT.  In 1996, plaintiff was reassigned as a GS-13 Management Analyst to the RMG team and she elected and was placed in HRT.  *See* T at 344-45 (Plaintiff), 524-25 (Slayton), 670-71 (Dorka).

8.   RMG supervisory personnel had differing opinions regarding plaintiff's performance and conduct.  Mr. Fairley, who was in her direct chain of command in another group several years earlier, thought well of her – considering her a good generalist.  *See* T at 19-

5

20, 25, 27-28, 76 (Fairley).  But, Mr. Slayton found plaintiff to be inefficient during the brief

time she was assigned directly below him, because, despite her putting in long hours, her end

results proved less than useful.  *See* T at 525-26 (Slayton).

    9.  Initially, Mr. Dorka thought that plaintiff was a competent employee. This

perception was based on Mr. Fairley being complimentary of her, and she was one of two GS-

13s in HRT whom he could use as a "right hand" subordinate.  *See* T at 203-05 (Dorka).  But as

time passed, Mr. Dorka's positive views of plaintiff's contributions to, and conduct within, HRT

began to deteriorate.  *See* T at 728-729.

    10.  Mr. Dorka's first concern with plaintiff occurred during HRT's office move.  Mr.

Dorka placed plaintiff in charge of the office arrangements for OCR's 125 employees.  He

admitted that she did an overall good job of handling matters – except for HRT's own move.

HRT was the last unit to move and, at the end of the day, when plaintiff was to move to a large

office, Mr. Dorka realized that he could not let that happen since it needed to go to two support

staff, whose office furniture needs dictated taking that space.  With the local union president and

the movers waiting for a decision, Mr. Dorka authorized a change without input from plaintiff

(who was out of the office at the time).  Mr. Dorka thought (and hoped) that plaintiff would

understand the need for such a change and that she would be satisfied with her newly assigned

office, which adjoined his and had a window.  Plaintiff was not.  She became very upset about

Mr. Dorka's decision.  She was not appeased by the office presented her and, instead, elected to

take the farthest office away from his.  Plaintiff told Mr. Dorka that by his actions, he had

"publicly disrespected [her] in front of everybody." Thereafter, Mr. Dorka observed plaintiff act

in ways that fragmented the team.  *See* T at 205, 227, 692 (Dorka explaining that HRT became

like "two camps . . . one camp of very disgruntled people that was being led by [Plaintiff], and

then there was another camp of people that just wanted to be there and do the work[.]", 726-29

(Dorka).

11.  Plaintiff did not have a background in areas assigned to HRT.  Paul Fairley

considered her a generalist.  Since she was not a specialist in the areas of procurement,

recruitment, retention, payroll, or time and attendance, Mr. Dorka assigned her to do *ad hoc*

projects.  Admittedly, she performed some successfully, especially where she had an interest in

the assigned area (*e.g.*, worklife programs, helping with Individual Development Plans, and

coordinating EDCAPS training).  Mr. Dorka rated plaintiff's performance highly in recognition

of her accomplishments on those particular assignments.  But, plaintiff was unable to accomplish

some simple projects (such as coordinating long-term training efforts, HRT's assignment

tracking system, helping to verify OCR's own database for tracking its own employees'

personnel actions, or understanding how to do office/space issues).  Nevertheless, Mr. Dorka still

rated her work highly based on his practice of issuing generous ratings and accolades to all

employees. Mr. Dorka did not limit good reviews to plaintiff; this was the "positive"

management approach he applied to other HRT members as well.  *See* T at 123 (Ms. Johns on

team-voted awards and Mr. Dorka giving her good reviews), 139-41 (Ms. Jordan on always

getting awards and getting good evaluations from Mr. Dorka), 179 (Ms. Jackson admitting Mr.

Dorka gave her many awards), 208- 211, 213-16, 220-226, 228-29, 243, 244, 258, 261, 702-03,

730 (Dorka); 466-67 (Plaintiff admits EDCAPS involvement is one of coordination not actually

facilitating the training sessions), 472 (Plaintiff admits Mr. Dorka is a nice guy), and 510

(Plaintiff admits that Mr. Dorka is prone to praising); 702 (Mr. Dorka admitting that even when

he was criticizing his staff, he gave them acceptable reviews).

12. The giving of generous awards to employees, and the tendency to shun the use of punishments, was part of the OCR office culture at that time. Mr. Dorka's immediate supervisor, Paul Fairley, admitted using this same "positive" management approach with Mr. Dorka as well. Mr. Fairley admitted to rating Mr. Dorka highly and to giving him performance awards – even while Mr. Fairley attributed some of the performance problems of HRT personnel to Mr. Dorka's inability to be an effective leader. *See* T 64, 71 (Mr. Fairly admits that he was aware that there were problems with supervising plaintiff), 67-68 (Fairly admits that awards were numerous and used as a morale booster).

13. By 1998, HRT had developed a poor reputation (due to tardy processing of travel, procurement and personnel actions, and taking a poor approach to customer service) with its client offices throughout OCR. Mr. Dorka learned this concern from other OCR office directors. To compensate, Mr. Dorka found himself working longer week days and on weekends, completing tasks assigned to subordinates, including plaintiff. *See* T at 683, 685-87.

14. Mr. Fairly acknowledged that HRT had personnel problems and he endorsed adding a GS-14 slot to help Mr. Dorka. Then, in mid-1998, Deputy Assistant Secretary Art Coleman announced the availability of four to six slots. The distribution of such slots was dependent on each team making its case for one. For six months, Mr. Fairley advocated for filling the new GS-14 slot *from within OCR*. Mr. Fairley was never successful in his bid to obtain the additional GS-14 slot for HRT or to oust Mr. Dorka. *See* T at 37, 56-7, 60, 65-66 (Fairley) and 695-96 (Dorka). Instead, OCR replaced Mr. Fairley. *See* T at 65 (Fairley).

15. HRT members specifically acknowledged their awareness of problems in the

8

team's performance through a memorandum they submitted to Mr. Dorka, dated April 29,1998. The intent of the memorandum was to persuade Mr. Dorka and senior OCR management to adopt an approach that would favor and improve their career-advancement situation as a means to address the HRT performance issues.  The HRT staff, led (at least in Mr. Dorka's mind) by plaintiff, proposed that existing HRT members be promoted and that outside individuals be hired to fill the lower-level slots they vacated.  Indeed, plaintiff told Mr. Dorka that if she became a GS-14 with a team of people working for her, then all of the team would do better work and he "could hire someone at a lower level to do the stuff that we don't want to do anymore." OCR senior management did not agree with such an approach, which Mr. Fairley had favored and Mr. Dorka had not.  *See* Ex. D15/P 44 (April 29, 1998 memo); T 60-62 (Mr. Fairley explaining team members' preference that new positions not be "opened up" to outside competition), 110 (Robin Johns stating that there were no problems in 1997, 1998 and 1999, things were going pretty well), 118, 119-20 (Robin Johns admitting that April 1998 memo did identify problems existing), 175-77 (Deborah Jackson on April 1998 memo), 689 (Mr. Dorka stating that HRT staff asking for promotions first if improvement were wanted), 693 (Plaintiff expressing her preference for having staff report to her and new hires to do "the stuff we don't want to do.").

16. Plaintiff testified at trial that she did not make mistakes and that her work product was always excellent, but subject to rejection based on Mr. Dorka's whims.  *See* T at 368-69, 373, 377-78, 455, 456-63, 466.

17.  Mr. Dorka testified that prior to the selection process he believed the HRT needed different resources to address HRT's deficiencies.  *See* T at 694 (Dorka).  In contrast, plaintiff testified that when she interviewed for the management analyst position at issue in 1999, she was

unaware of any team performance problems.  *See* T at 483 (Plaintiff asserting her lack of

awareness of team performance problems in 1999), 689-90 (Mr. Dorka describing conversations

with the team about poor performance).  During cross examination, plaintiff did admit to helping

draft the April 1998 memorandum that identified team performance issues.  *See* T at 391

(Plaintiff admits drafting the memo).

18.  Mr. Dorka conducted various team meetings at which he explained to his team

that they should not expect any promotional opportunities unless significant improvements

occurred in criticized areas, and that persons with new sought-after skill sets might be brought in.

Seeing other RMG units afforded extra positions for promotional advancement made the HRT

staff more frustrated and caused them to attribute the lack of promotions on the team to Mr.

Dorka's being an ineffectual leader.  They treated him as such at staff meetings.  *See* T at 97

(Ms. Johns stating that team was upset with Mr. Dorka's staff meeting presentations), 395

(Plaintiff admitting that Mr. Dorka was right that team could do better), 691-92 (Mr. Dorka on

acrimonious staff meetings), 758, 764 (HRT told Dorka that he was not fighting hard enough for

the team). When Mr. Dorka suggested that an approach might be the recruitment of persons with

new needed skill sets, the HRT staff displayed their extreme displeasure in most disrespectful

ways during staff meetings.  *See* T at 691-92 (Mr. Dorka on acrimonious staff meetings), 64 (Mr.

Fairley's testimony concerning one particularly boisterous staff meeting during which he thought

(based on their reports to him) that HRT members "were concerned about having to compete

outside OCR.").

19.  Mr. Dorka admitted that occasionally he used the phrase "new blood" to explain

that he might need to recruit additional persons with sought-after skill sets to improve team

performance. HRT members expressed displeasure at the prospect of having to compete with outsiders for posted promotional opportunities, which they felt entitled to as insiders. *See* T at 64 (Mr. Fairley on how HRT members complained to him about having to compete for a promotion), 262-64, 267-68, 279-80 (Mr. Dorka on his use of "new blood" and possibility of outside hiring), ¶ 15, supra (regarding HRT's 1998 memo proposing internal-only promotion competitions)**.**

20.   Several HRT members, including the plaintiff, testified that they viewed Mr. Dorka's expressions as a sign of age discrimination.  Mr. Dorka denied ever using age-biased expressions or intended such, but some HRT members testified that, even before the job at issue became available, they heard Mr. Dorka use the phrase "fresh, young blood" or that the words "new blood" were simply code for his preference for younger people. *See* T at 121-22 (Johns), 148-49, 153, 166-67 (Jordan), 170-73, 185-86 (Jackson), 262-63, 266-68, 279-80 (Dorka's denial), 403, 410, 412, 417, 421, 422, (Plaintiff).

21.   Plaintiff called Raymond Smith as a witness.  Mr. Smith testified that he heard Mr. Dorka "comment to the effect that the team was a little like over the hill, we needed new blood on the team" and that Mr. Dorka's comments about bringing people onto the team from the outside "brought a great deal of contention on the team." *See* T at 87. But, during cross examination, Mr. Smith acknowledged that he was not a member of HRT in 1998 or 1999. He joined HRT after the selection at issue was made. *See* T at 93.

22.   Plaintiff offered Diane Jordan as a witness. Ms. Jordan testified that on more than two occasions Mr. Dorka stated that he intended to hire a "younger person from OM." *See* T at 148.  She also stated that she heard Mr. Dorka wanted to hire someone from OM as early as 1998

– even before Mr. Slayton secured the position at issue (in early 1999). *See* T at 158. She made

no contemporaneous report of Mr. Dorka's alleged use of what she said she believed was an age-

biased phrasing.

23. Plaintiff offered Deborah Jackson, who testified that although during an earlier

fact finding conference she said Mr. Dorka had used the term "new blood," not "young blood,"

she believed the two terms were interchangeable. *See* T at 186. Ms. Jackson made no

contemporaneous report of Mr. Dorka's alleged use of what she said she believed was age-biased

phrasing.

24. Plaintiff testified that even before the position was posted she heard Mr. Dorka

state that he "was going to fill the job with new and younger blood from the Office of

Management" – as early as 1998. *See* T at 439-40. Plaintiff could not explain how Mr. Dorka

could have possibly known, in 1998, that anyone from OM would apply for an opening that was

not even approved until early 1999. *See* T at 439-40. Additionally, plaintiff's trial testimony

differed from what she said at the administrative fact-finding conference in 2000, where plaintiff

did not mention anything about someone from OM being favored for the opening. *See* T at 436,

403, 410, 412, 417, 421, 422 (Plaintiff's beliefs). Plaintiff also made no contemporaneous report

of Mr. Dorka's alleged use of what she said she believed was age-biased phrasing. *See* T at 480-

82 (Plaintiff reported no discriminatory statements and, instead, prepared for her interview

because "[she] thought [she] had a shot[.]").

25. None of the other decision makers for the position at issue heard of Mr. Dorka

saying or using the adjective "young," or ever expressing a preference for a younger hire. *See* T

at 533, 536 (Slayton, indicating HRT needed "new skill sets"), 595 (Ms. Fennell not hearing of

any age preference), 628 (Ms. Hakel, testified that as a civil rights attorney, she would not

participate in any discriminatory hiring process).

26.   In 1999, at about the same time that he was given permission to add a full time

staff member to HRT, Mr. Dorka also created and filled a temporary detail (lasting 60-90 days)

that he used to bring Vick Iala, the Department's space and real estate expert, over to HRT to

assist it with space and furniture management issues. In early 1999, Mr. Iala "got a little

disgruntled in the Office of Management" and asked Mr. Dorka if he could come over to OCR to

help HRT "for a little while, a little cooling-off period." *See* T at 699 (Dorka). Mr. Dorka told

Mr. Iala that the process for getting Mr. Iala detailed over to HRT was the creation and

advertisement of a detail under the Department's mobility assignment program ("MAP"). In

1999, Mr. Dorka announced a MAP detail position for someone who knew space, real estate,

GSA and furniture, and, from the three individuals who applied, Mr. Dorka selected Mr. Iala.

Before Mr. Iala came to the team, in mid 1999, Mr. Dorka told HRT that he intended to bring

someone in from the Office of Management to assist the team with space and real estate issues.

During a meeting, when some of the team questioned Mr. Dorka's need to go outside for help,

Mr. Dorka explained: "I've been begging for somebody to help me do this, and nobody wants to

volunteer, everybody is too busy. So I am going to go find hands that can do this at no cost to

Office for Civil Rights, thank you." *See* T at 701.

27.   In January 1999, Mr. Slayton, who was previously the Budget Team Leader,

replaced Paul Fairley as RMG's leader. Upon assuming the RMG lead position, Mr. Slayton,

who had observed Mr. Dorka working late to ensure completion of projects he had assigned to

the HRT, successfully persuaded Senior OCR management of the need for Mr. Dorka to have a

senior management analyst on board. In this way, HRT would acquire the needed skill sets, freeing Mr. Dorka to focus on the management aspects of his job. *See* T at 65-66 (Fairley), 274-75, 696-98 and 709 (Mr. Slayton advising Dorka to take his best shot at hiring somebody who will help turn the HRT team around), 530-33 (Slayton).

28.  Unlike Mr. Fairley, Mr. Slayton believed that an external candidate would be preferable. *See* T 530-31.

29.  The Management/Program Analyst, GS-13 or -14, Human Resources Team position was established on March 4, 1999. *See* T at 531 (Slayton); Exs.P1-P4; Ex. D4.

30.  The vacancy was to be filled by a senior staff analyst, evaluator, and advisor to management, serving 750 OCR employees nationally, with 680 of them located in 12 field offices. Specifically, this person would dispense advice on the effectiveness and efficiency of OCR program management and administrative operations (telecommunications, space management, security, performance evaluations), which also covers personnel administration, Human Resources (HR) policy, family friendly programs, staffing/ceiling control, staff development, procurement, human resources management, EEO and labor relations, employee development and non-program training activities. *See* T at 197 (Dorka); Ex. 4 at 2; Ex. 5, Interview Questions, Attachment (background); Exs. D3 and D11.

31.  The Department posted vacancy announcement # 99-088VB in March 1999. OCR was seeking someone who could manage complex projects, demonstrate leadership, had an excellent business acumen, and appreciated the meaning of good customer service with actual experience in those areas. In particular, Mr. Dorka, who drafted the job announcement, with a listing of the necessary knowledge, skills, and abilities ("KSAs"), indicated that HRT sought

14

someone to assist the team in completing its more complex tasks.  *See* T at 531 (Slayton) and 697-98 (Dorka).

32.  The KSAs are criteria used to rate candidates for a position. The criteria are based upon the core functions of the position and assign a point value to each criterion based upon the candidate's application.  *See* T at 277, 283 (Dorka); Ex. D4.

33.  The position was designated a career ladder position (with full performance at the grade 14 level), which allowed the Department to post it for competitive filling at either the GS-13 or GS-14 level, with expectations for grade 14 level candidates being higher than those at the grade 13 level.  *See* Ex. 5, T at 633 (Hakel).

34.  In March 1999, the vacancy posted as merit promotion announcement # 99-088VB was advertised Department-wide.  Both the plaintiff and Nichelle Moorefield, the eventual selectee, placed their names as one of fifteen candidates competitively seeking the opening at either the grade 13 or 14 level in March 1999. Mr. Dorka requested that the initial announcement be withdrawn. The announcement was re-posted in May 1999, making it open to any eligible candidate within the D.C. metro commuting area. Mr. Dorka had initiated this move hoping for as optimum a number of qualified candidates to be considered for his one chance to fill this critical opening.  *See* T at 703 (Dorka); Exs. D3 and D7.

35.  Plaintiff and the fifteen other candidates, including Ms. Moorefield, were all automatically considered when the opening was posted again.  *See* T at 349 (Plaintiff) and 704 (Dorka); Ex. D5.

36.  When it became apparent that HRT would be permitted to hire an additional fulltime person, Mr. Dorka, the designated selecting official, asked his immediate supervisor Mr.

15

Slayton, about using an interview panel as a selection tool. The use of an interview panel was an acceptable selection within OCR. Mr. Dorka was told that it would be a good validation tool for him to use – bringing a fresh perspective – for such an important selection. Mr. Slayton authorized Mr. Dorka's use of the interview panel.  *See* T at 46 (Fairley), 534 (Slayton), 545 (Fennell), 607 (Hakel), 709-10 (Dorka).

37.   Messrs. Dorka and Slayton agreed to ask two other OCR employees to join Mr. Dorka on the Interviewing-Selection panel. These two other persons were Rosemary Fennell (born in 1949) and Karen Hakel (born in 1944).  *See* T at 270, 709-10 (Dorka), 534-35 (Slayton).

38.   The criteria for selecting the panelists who would serve with Mr. Dorka on the interview panel were persons who were customers, who could offer a fresh perspective, individuals who understood OCR management, individuals at the grade level 14 (thereby having an appreciation for the duties an incumbent at that level would have).  *See* T at 727, 09-10, (Dorka) and 534-35 (Slayton).

39.   Rosemary Fennell, long-time human and civil rights activist, was a GS-14 Program Manager, Program Legal Group (PLG), OCR Headquarters. Her tenure with the Department of Education was over a quarter of a century. Her portfolio at PLG included acting as liaison with the public and informing the office about resources that enabled the public to be better informed about enforcing civil rights laws and regulation in the education setting. She worked to facilitate achieving such a goal by developing relevant materials and other means to communicate such interests. Another benefit for having Ms. Fennell on this panel was that she had served on other interview panels before this particular selection process.  *See* T at 539-45, 566 (Fennell); Fennell Dep. Tr. at 24-25 (Apr. 6, 2004), Ex. 2.

16

40.   Karen Hakel, a GS-14 Supervisory Attorney/Team Leader, OCR Compliance Team 2, likewise fit the panelist criteria. As someone who supervised a team of investigators and attorneys out in the field, she provided that regional office perspective. HRT served headquarters and field units. Ms. Hakel had prior experience serving on approximately six other interviewing panels.  *See* T at 602-06, 607-08 (Hakel); Hakel Dep. Tr. at 10-12 (Apr. 6, 2004), Ex. 1.

41.   After he re-posted the vacancy announcement, Mr. Dorka had approximately 18 applications of qualified candidates, who all were vetted by human resources personnel, as eligible for selection to the position after further review by OCR officials involved in the selection process. He determined, for professional courtesy, that any OCR candidate would be automatically interviewed. Mr. Dorka then added to his interview list all Department applicants based on departmental rules mandating if one Department employee is granted an interview, all internal candidates must be granted that opportunity. He decided that four to five of the remaining seven external candidates would be added to make a total of ten interviews. He told Mr. Slayton of his goal of conducting the ten interviews and completing the whole selection process before the end of the fiscal year to avoid any possible personnel freeze that might occur. To do this, Mr. Dorka's goal was to complete the allotted interviews by September 28, 1999, and to have OM make an offer by September 29, 1999.  *See* T at 276, 307, and 707-10 (Dorka).

42.   To ensure uniformity and fairness, each candidate was asked the same type of questions during this process, Mr. Dorka prepared eleven interview questions that followed the KSA themes.  *See* T at 293, 305-06, 711; Ex. P20; Ex. D11.

43.   Mr. Dorka contacted candidates to ascertain if each person had a preference for a

specific time and date from the times available to the panel members – Friday, September 24, 1999, or Tuesday, September 28, 1999. Based on giving HRT candidates scheduling preferences first, the interview schedule was set as follows: Janice Harris, Ella Washington, Plaintiff, and then Marian Harris for the first day; and for the second day, Pat Scheer, Belinda Kane, Dale Amidon, Darlene Thronton, and Nichelle Moorefield (now Henderson).  *See* T at 712-13, 717 (Dorka).

44.  Mr. Dorka provided both Ms. Hakel and Ms. Fennell with the application package of each candidate (resume and KSA responses, etc.), as well as the position description and KSAs for the job and the set of interview questions. He first met with them around September 15, 1999. When they asked Mr. Dorka what qualities they should look for in each candidate, Dorka referred them to the KSAs as their guide. The panelists evenly divided the questions among themselves and maintained the same order of questioning and questions for consistency and fairness during the entire interview process.  *See* T at 277, 283, 292, 765, 766-68 (Dorka), 547-51, 572, 575 (Fennell), 612, 614, (Hakel); Fennell Dep. Tr. at 22, 30-31, 33 (Apr. 6, 2004), Ex. 2.

45.  Ms. Hakel and Ms. Fennell both denied that Mr. Dorka attempted to influence them in any way in how they scored each candidate or to select anyone in particular.  *See* Hakel Dep. Tr. at 19-20 (Apr. 6, 2004), Ex. 1; Fennell Dep. Tr. at 28 (" . . . I felt confident that we had an objective process.") and 41 (Apr. 6, 2004), Ex. 2. Interview panelists Hakel and Fennell both denied that a candidate's age was any factor in their decision-making and each indicated that they would vehemently oppose such an approach if made known to them.  *See* T at 565, 595 (Fennell), 628, 631 (Hakel). Mr. Dorka did not inform the panelists that he was having

personnel problems with any particular person on his team.  *See* T at 766-68 (Dorka), 567, 595

(Fennell), 651, 657 (Hakel), 500-01 (Plaintiff admitting that panelists did not inquire about age

or indicate an interest in anyone from OM).

46.  With each of the interviewees having been found qualified for the position in

question, the panelists decided that a candidate's interview itself would be the determinative, if

not decisive, criteria in the ranking and selection process. The panelists admitted to just

superficially reviewing a candidate's application – focusing more on that person's KSA

responses and putting great weight on how the candidate addressed the questions posed during

the interview.  *See* T at 273 (Dorka) and 551, 575 (Fennell).

47.  Each panelist recorded contemporaneous notes on how each candidate answered

or responded to a question. The panelists separately and independently rated each candidate on

how that candidate answered each question on a scale from one to five (with five being the best).

Mr. Dorka prepared a matrix that displayed the scores each candidate received from each

panelist as to each question and a tally score. All three panelists recollected their impressions of

plaintiff's, and the selectee's, interview performances.  *See* T at 309, 732 (Dorka), 586, 601

(Fennell) and 657-58 (Hakel); Exs. D9, D10, D12.

48.  Although plaintiff testified that she prepared for the interview, she received

scores of 37.50, 40, and 37 from Dorka, Fennell and Hakel, respectively.  *See* ¶ 24 and Ex. D13.

Their evaluation of plaintiff's candidacy, based on her interview, placed her in the bottom third

of the nine candidates interviewed.  *See* Ex. D 13; T at 600 (Fennell), 655 (Hakel), Ex. D14.

49.  In contrast to how plaintiff – by her own admission – had discharged her duties

when she previously served on an interview panel, Ms. Hakel and Ms. Fennell actively

19

participated as members of the selection panel here.  *See* T at 446-53 (Plaintiff, looking to avoid conflict, gave away her vote).

50.  Plaintiff testified that it was her belief that she performed well during the interview process; however, she did not have a distinct recollection as to how she actually responded to the questions posed. Instead, plaintiff was able only to testify about what she believed she may have said.  *See* T at 385 (stating, "well, I *had to have* spoken about the worklife program") (emphasis added).  Meanwhile, it was the recollections of the panelists that plaintiff's performance during her interview was average, at best, with some of her replies characterized as rambling and others as not at all responsive to the question being asked.  *See* T at 386-87 (Plaintiff denying that she rambled but stating her belief that she was the best qualified), 558-560, 594 (Fennell), 616-21, 647-49 (Hakel) and 299, 304, 313-14, 239, 715 (Dorka).

51.  Ms. Hakel explained that she expected more of plaintiff and other candidates who, like plaintiff, were eligible, and therefore competing, for the position at a grade 14 level, rather than at a grade 13 level.  *See* T at 569 (Fennell), 618, 633, 649 (Hakel). Ms. Hakel also found certain commentary from plaintiff inappropriate.  In particular, Ms. Hakel did not appreciate certain statements by plaintiff – complementing Ms. Fennel and Mr. Dorka's wife – which Ms. Hakel viewed as gratuitous, and therefore as a negative.  *See* T at 619-20 (Hakel).

52.  As for plaintiff's performance during the interview, Mr. Dorka wanted to know whether the plaintiff could admit that she had made errors of judgment when she acted as a divisive factor on HRT, rallying certain team members against Mr. Dorka as the manager. He further wanted to hear whether plaintiff would now be willing to become a contributing member,

rather than detractor of his vision and goals.  From plaintiff, Mr. Dorka was looking for a recommitment to being loyal to what he saw as the mission of HRT.  *See* T at 721-22. Specifically, Mr. Dorka testified that plaintiff "didn't feel the pain of our poor customer service. She was leading a different camp that was leading my -- that was taking my leadership away from me, okay? . . . Gloria's opportunity at that interview was to say, 'Nick, I'm going to try it a different way. I'm going to try it your way, all right? . . . I understand that there are disgruntled employees and I have been feeding into that. I'm going to stop that, I'm going to get away from that camp, I'm going to be a new, independent-thinking person. . .' .." *See* T at 716 (Dorka) and 770-771 (Dorka stating under the right scenario he could have selected plaintiff, even though such an internal selection was not favored by Mr. Slayton and senior OCR management), 538 (Slayton stat that such a selection would have quite a concern for him). Mr. Dorka did not hear what he was looking for from plaintiff; indeed, she testified that she was unaware of his concerns about the team's issues.  *See* ¶ 17, supra.

53.  The cumulative ratings from the scorecards found in Exhibit 5 show that applicants Kane, Scheer, Amidon and M. Harris scored higher than plaintiff.  In 1999, when the contested selection was made, these applicants' ages were 41, 48, 50 and 56, respectively.  *See* Ex. 5 and excerpts from applications of Kane, Scheer, Amidon and M. Harris, Ex. 7 (filed under seal); Compl. ¶ 11.  The lowest-scoring candidate (Ms. Thornton) was also the youngest.  *See* Ex. D14.

54.  Marian Harris, the oldest interviewee (born 1943), was the leading candidate after the first day of interviewing (which interviews had included plaintiff's).  Mr. Dorka was so impressed with her interview responses that he contacted Ms. Harris's references at

the close of the first day of interviews.  Mr. Dorka explained that should a better applicant not

appear during the second day of interviewing, he could see working with Mr. Harris to get HRT

back on track.  *See* T at 713-15.

55.  Ms. Moorefield, the selectee, was the last candidate to be interviewed.  She

demonstrated that she had the experience of quality accomplishments, proven initiative,

motivation, and enthusiasm for them to take notice of her over the other candidates.  Her reported

knowledge, skills and abilities were substantial.  So impressed were the panelists with her, after

her interview, that each rated Ms. Moorefield to be his or her top candidate.  For each panelist,

Ms. Moorefield did not even have a close second.  Mr. Dorka scored her at 48.75; Ms. Hakel and

Ms. Fennell gave her perfect scores of 55.  *See* Ex. 5 (attached score sheets); T at 287, 296-303,

310, 320, 324-25, 327, 331-32, 718-20, 733 (Dorka), 552-57, 579, 594-95 (Fennell), and 621-25,

659 (Hakel).

56.  Ms. Hakel and Ms. Fennell each explained why they gave Ms. Moorefield perfect

scores.  Ms. Moorefield was the last applicant to be interviewed and each panelist individually

and independently wanted to ensure that Ms. Moorefield was seriously considered, if not

selected, for the opening at the GS-13 level.  *See* T at 553-54 (Fennell admitting as much that she

wanted to ensure this candidate, who had impressed her with her presentation and answers, had a

shot at getting the job); T 624-25 (Hakel was surprised herself about awarding a perfect score but

believed Moorefield answered some of the questions better than she (Hakel) would have).

57.  When asked about what she would have done if, at any point during the process,

anyone told or suggested to her that the position should be filled with a younger person, Ms.

Hakel testified that "I would have excused myself from the process because I am an attorney

working for the Office for Civil Rights with the responsibility to enforce anti[-]discrimination

laws . . . ." She further explained: "[W]hat would be the point of my serving on a panel if I am

not free to give my best judgment . . . . It would be a waste and it would imperil my career." *See*

T at 629 (Hakel).

58.   Ms. Fennell testified that no one had suggested to her that the position should be

filled by a younger person.  She further stated that she would have been "shocked" and would

have "reported" Mr. Dorka if he had told her that the position should be filled with a younger

person.  She said that she would have "considered [the notion] unethical."  *See* T. at 565.

59.   The ratings of the other two panelists bolstered and confirmed what Mr. Dorka,

too, had seen.  He was looking for someone who could handle complex assignments, had

leadership potential, and could apply keen business acumen to the areas of human resources.  Ms.

Moorefield showed the panel that she could lead (having participated in the White House-level

National Women's Leadership Group), and had some management expertise (having worked in

the Office of Management).  To the panelists, Ms. Moorefield demonstrated that she became

highly motivated by serious and complex projects.  Mr. Dorka saw her previous work as

paralleling what he wanted to do with his team.  She had technical skills making web

pages,"benchmarking" studies, strategic planning, human capital investment, performance

measurements, and process improvement.  *See* T at 312-20, 717-20 (Dorka).

60.   Mr. Dorka had not previously met Ms. Moorefield.   After the second day of

interviews, Mr. Dorka contacted Ms. Moorefield's references. Mr. Dorka testified that Ms.

Moorefield's then first line supervisor, Ann Mannheimer, told him that he was taking away one

of the best people in her unit.  Ms. Mannheimer agreed that Ms. Moorefield would make a good

choice. *See* T at 734 (Dorka).

61. Mr. Dorka conferred with his supervisor, Mr. Slayton, who agreed with the selection of Moorefield for the position. *See* Ex. 5; T at 733 (Dorka). As a result, Ms. Moorefield was offered the Management Analyst position and was duly promoted to the grade 13 level on November 7, 1999. After making his selection, Dorka personally visited each of his internal team candidates and told each of them of his decision. *See* T at 735 (Dorka).

62. Neither the panel members nor any other decision-making official involved in this matter ever heard Mr. Dorka outwardly express, or otherwise imply, that he preferred a younger person for the position. *See* T at 533 (Slayton), *See* also *supra*, ¶¶ 25, 57, 58.

63. After the selection of Ms. Moorefield, plaintiff told Mr. Dorka that in selecting Ms. Moorefield, he did what "was best for the team." *See* T at 736.

## CONCLUSIONS OF LAW

### I.      Legal Standard for ADEA

This case is governed by the Age Discrimination in Employment Act of 1967 ("ADEA"), as amended, 29 U.S.C.A. §§ 621-634 (West 1999 & Supp. 2005). Pursuant to the ADEA, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). In cases involving allegations of disparate treatment "liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision. That is, the plaintiff's age must have actually played a role in [the employer's decision making] process and had a determinative influence on the outcome." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000) (internal quotation marks omitted).

In cases where direct evidence of prohibited discriminatory treatment is lacking, ADEA claims are governed by the evidentiary scheme set forth by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under the *McDonnell Douglas* line of authority, a plaintiff first must prove by a preponderance of the evidence a prima facie case of discrimination.  *McDonnell Douglas*, 411 U.S. at 802.  In cases brought under the ADEA and involving allegations of non-selection, a plaintiff establishes a prima facie case, thereby creating an inference of unlawful age discrimination, by showing that: (1) she was a member of the statutorily protected age group (over the age of forty); (2) she was qualified for the position in question; (3) she was not hired or promoted to that position; and (4) a substantially younger person was selected instead of her.  *See Koger v. Reno*, 98 F.3d 631, 633 (D.C. Cir. 1996).[1]

In this case, plaintiff has set forth certain facts, which defendant does not dispute, sufficient to establish a prima facie case with respect to her 1999 non-selection.  But, success at this initial stage means only that a plaintiff has established a rebuttable presumption of unlawful discrimination.  *Thomas v. Nat'l Football League Players Assoc.*, 131 F.3d 198, 202 (D.C. Cir. 1997), vacated in part on other grounds, *Thomas v. Nat'l Football League Players Assoc.*, No. 96-7242, slip op., 1998 WL 1988451 (D.C. Cir. 1998).  The burden of production then shifts to the defendant to provide a legitimate, non-discriminatory basis for having taken the particular employment action at issue.  Upon providing a legitimate explanation, the burden then shifts back to plaintiff to establish that the employers' explanation is merely a pretext for unlawful retaliation.  *Thomas*, 131 F.3d at 202.  The defendant has satisfied its burden of producing a

---

[1] It is not always necessary that plaintiffs meet the fourth prong of this standard:  a plaintiff may be able to make out a case for discrimination without showing that she was replaced by someone outside the disfavored group. *See Stella v. Mineta*, 284 F.3d 135, 146 (D.C. Cir. 2002).

legitimate, non-discriminatory reason for its decision: merit.  Accordingly, the burden shifts back to plaintiff.

Although under the *McDonnell Douglas* framework the "intermediate evidentiary burdens shift back and forth . . . "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143.  Because plaintiff and defendant each met their *McDonnell Douglas* burdens, the remaining issues are: (1) whether plaintiff, by a preponderance of the evidence, has demonstrated discrimination against plaintiff because of her age; and (2) whether "but for" plaintiff's age, she would have been awarded the promotion she sought.  *Hayman v. National Academy of Science*, 23 F.3d 535, 538 (D.C. Cir. 1994).  The Court finds that plaintiff has failed to meet her burden of proof on either issue.

## II.   Analysis

The Court denied defendant's Motion for Summary Judgment based on plaintiff's allegations of pretext because: (1) plaintiff claimed Mr. Dorka said that he was looking for "new and young blood from the OM,"; and (2), plaintiff asserted that perfect scores were improbable and thus it was possible that the other two panelist were influenced by Mr. Dorka to prefer one of the younger applicants.  However, at trial, plaintiff failed to provide evidence to support her assertions.  After having the opportunity to assess the credibility of all of plaintiff's witnesses, and to test plaintiff's assertions, the Court finds for defendant.

### A.   Age Discrimination Claim

Plaintiff alleges that Mr. Dorka discriminated against her by choosing Ms. Moorefield because she was younger.  The Court disagrees.  Plaintiff's testimony about what Mr. Dorka

supposedly said to the team about possibly needing new blood was confusing.  The Court can find nothing appalling about a manager indicating that he may need to bring new blood to a team that did not perform in 1998, or believing at the same time that someone from outside HRT for the position may be preferred.  Moreover, defendant's witnesses were credible.  The panel members' testimony about why they rated Ms. Moorefield as their top choice was grounded in common sense and sound judgment.  Furthermore, Mr. Dorka's testimony that he used the term "new blood" to mean an additional individual for the team proved to be consistent with how HRT responded.

There is no credible evidence that Mr. Dorka intended to hire someone younger for the new position.  In fact, Department posted the management analyst position internally in March 1999. Plaintiff, Ms. Moorefield and a host of other employees from the Department applied. However, Mr. Dorka decided to withdraw the announcement in order to broaden the applicant pool.  *See* ¶ 34.  If Mr. Dorka had always intended to hire a younger person from the Office of Management, he could have done so in March 1999, since Ms. Moorefield was already in the pool.  In the end, there is not sufficient evidence that anyone from HRT ever complained about Mr. Dorka's supposed pre-selection statements.

Plaintiff's actions, in contrast, demonstrate that her allegation of age discrimination lacks merit. Although Plaintiff testified that Mr. Dorka openly displayed his preference for younger employees, not once did she complain to the EEO office or management officials about Mr. Dorka's alleged discriminatory conduct until *after* she was denied the promotion.  *See* ¶ 24.  It also seems odd that plaintiff actually expended time and energy to compete, if Mr. Dorka had made it so abundantly clear that he wished to hire a younger person from OM.

**B.      Selection Panel**

_____After plaintiff was interviewed on Day One, the panel interviewed Ms. Moorefield as the

last candidate on Day Two.  Ms. Moorefield left such a positive overall impression on all

panelists that she was unanimously ranked first.  *See* ¶ 55.  Plaintiff, on the other hand, received a

composite ranking of seventh out of nine.  *See* Ex. D14.  Although, on paper, plaintiff appeared

more qualified for the position, the selection at issue was not based merely on a review of each

applicant's paper application. The panelists focused, instead, and not improperly, on the

interviews.  *See* ¶¶ 50, 51 52 and 60.  Furthermore, Mr. Dorka knew, from personal experience,

how plaintiff was performing and what effect she was having in HRT.  The federal anti-

discrimination laws do not require that employers select the best "paper candidate," and thereby

disregard a manager's prior experiences with particular applicants, or management's perceived

needs at the time.  *See Shesko v. City of Coatesville,* 324 F. Supp.2d 643 (E.D. Pa. 2004).  Each

panelist agreed independently that Ms. Moorefield was the best candidate for the position.  Each

also agreed independently that plaintiff was not a close second, although each interviewer's

specific approach to evaluating the candidates differed.  *See* ¶¶ 50, 51, 55 and 56.

In the final analysis, plaintiff produced no evidence that the interview panel made its

decision based on the candidates' respective ages.  Ms. Fennell and Ms. Hakel testified that they

are dedicated to the field of civil rights, and they appear from their records to be persons of

personal and professional integrity.  They did not previously know the candidates or Mr. Dorka

in any manner that calls into question their objectivity or judgment relating to this selection

process.  Additionally, they testified that they were not the type of individuals who could be

induced or coerced into engaging in improper conduct in the workplace, and that they would not

tolerate any known misconduct.  *See* ¶¶ 39 and 40 and T at 546, 565, 571 (Fennell), 612-13, 615,

619-20, 628-29 (Hakel), 272 (Dorka) 534-5 (Slayton).  If Mr. Dorka was predisposed against age,

voluntarily adopting an interview panel, and then inviting Fennell and Hakel to participate on it,

would have been counterproductive.  Plaintiff has not established that the Department, through

the interview panel, or by any other means, is liable for age discrimination.

**III.    Damages**

Because plaintiff has not established by a preponderance of the evidence either age

discrimination or that plaintiff would have been selected for promotion "but for" the unlawful

consideration of age, plaintiff is not entitled to a retroactive promotion or to back pay.

## CONCLUSION

Plaintiff has not established that the Department, through the interview panel, or by any

other means, is liable for age discrimination.  Accordingly, the Court enters judgment in favor of

defendant.

A judgment consistent with these findings shall issue this date.

Signed by Royce C. Lamberth, United States District Judge, June 13, 2006.